IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 1999 Session

## STATE OF TENNESSEE v. CECIL L. GROOMES, ET AL.

**Direct Appeal from the Circuit Court for Williamson County**
**No. I-1097-381-B, I-1097-381-C     Donald P. Harris, Judge**

_____

**No. M1998-00122-CCA-R3-CD - Filed August 10, 2000**
_____

The defendants were convicted in Williamson County of especially aggravated robbery from an incident occurring at the Cool Springs Mall. Defendant Akins was sentenced to twenty years and fined $1,000, while defendant Groomes was sentenced to twenty-two years and fined $4,000. Both timely appealed, raising as issues whether Akins should have been transferred from juvenile court and tried as an adult, whether the prosecutor improperly excused a potential juror and made prejudicial statements in closing argument, whether the court properly instructed the jury, whether the evidence was sufficient, whether the victim's family and friends had improper contact with the jurors, and whether the defendants received appropriate sentences. Based upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY, J., joined. JAMES CURWOOD WITT, JR., J., filed a concurring opinion.

Judy A. Oxford, Franklin, Tennessee, for the appellant, Cecil L. Groomes.
Marilynn A. Tucker, Primm Springs, Tennessee, for the appellant, Terrancé E. Akins.

Paul G. Summers, Attorney General and Reporter; Lucian D. Geise, Assistant Attorney General; Ronald L. Davis, District Attorney General; and Derek Keith Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendants, Cecil L. Groomes and Terrancé E. Akins, appeal as of right from their convictions in a consolidated trial for the especially aggravated robbery of the victim, Jesse Puckett. After a jury trial in the Williamson County Circuit Court on April 7-9, 1998, defendant Akins was sentenced to twenty years at one hundred percent, based upon the trial court's finding that he was a violent offender pursuant to Tennessee Code Annotated § 40-35-501(i)(2)(E). Akins was also fined $1,000. Defendant Groomes received a sentence of twenty-two years at one hundred percent as a violent offender plus a fine of $4,000.

Defendant Terrancé Akins, a juvenile being tried as an adult, proceeded at trial *pro se* with elbow counsel but was appointed counsel for his appeal. His appellate counsel filed several briefs and then withdrew. Substitute appellate counsel was appointed to represent Akins and has incorporated the issues raised by Akins's previous counsel into his brief. Therefore, we will address all of the issues raised by Akins's two attorneys in addition to those raised by defendant Groomes. The defendants collectively raise the following issues for our consideration:

(1)  Whether the juvenile court judge erred in transferring defendant Akins, a juvenile at the time of the alleged offense, from juvenile court to be tried as an adult;

(2)  Whether the trial court erred in allowing the State to exercise a peremptory challenge on the basis of race in violation of Batson v. Kentucky;

(3)  Whether the trial court erred in allowing the prosecutor to make improper and prejudicial statements in his closing argument;

(4)  Whether the trial court erred by not letting the jury consider whether the prosecution had proved the element of serious bodily injury beyond a reasonable doubt;

(5)  Whether the trial court erred in refusing to instruct the jury on all lesser-included offenses, including carjacking, robbery, aggravated robbery, and an attempt to commit these offenses;

(6)  Whether the evidence at trial was insufficient to support a finding of guilt beyond a reasonable doubt on the charge of especially aggravated robbery;

(7)  Whether the jury verdict is invalid because of improper contact with the victim's family and friends; and

(8)  Whether the trial court erred in failing to sentence defendant Akins as an especially mitigated offender and in failing to consider mitigating factors (1) and (2) in sentencing defendant Groomes.

After careful review of the record, we AFFIRM the judgment of the trial court.

**PROCEDURAL BACKGROUND**

The Williamson County Grand Jury returned indictments against the defendants, charging them with especially aggravated robbery. Defendant Akins was transferred from juvenile court to stand trial as an adult. Defendants Akins and Groomes pleaded not guilty. The cases were consolidated and subsequently tried for four days in April 1998, before the jury returned a verdict of guilty as charged for both defendants. The defendants were sentenced on June 22, 1998.

## FACTS

The State's first witness was the victim, Jesse Puckett, who described the events at the Cool Springs Mall in Franklin, Tennessee, on August 31, 1997, that left him with a gunshot wound to the chest. The victim testified that he and his cousin, Greg Moore, drove the victim's 1988 blue Cadillac to the mall between 5:00 and 5:30 p.m. The victim had just added $4,000 worth of new rims and tires to his car. As he was looking for a parking space, the victim noticed a maroon, four-door Cadillac Fleetwood following him as he traveled up and down several aisles. The victim parked his car, and he and his cousin proceeded to the entrance of a store, where the victim was going to exchange some tennis shoes. The maroon car parked several spaces up from his car, after which, the victim saw four black males looking around and in his car. Thinking that they were about to steal his car, the victim told his cousin to exchange the shoes, and he returned to the vehicle. At some point, the victim saw two of the men walking toward the mall and the other two getting into the maroon Cadillac.

As the victim started his car and began backing out of the parking space, his driver's side door flew open. He testified that he saw a black male, identified as Rick "Cry Baby" Jordan, with a pistol and another black male standing behind Jordan with a shotgun pointing upright at the victim. At trial, the victim identified defendant Akins as the man with the shotgun.[1] Meanwhile, the maroon car backed out of its parking space and was positioned in a way that blocked the victim's car from exiting. Jordan ordered the victim to get out of his car, and, when the victim refused, Jordan shot him in the chest with the pistol. Jordan then proceeded to pull the victim out of his car, and Jordan and Akins fled the scene in the victim's car.

The victim described how he held his chest, which was bleeding profusely, and began calling for help. A lady came to his aid, and an ambulance was called. The victim remained conscious and remembered talking to the ambulance attendants. He testified that he spent two days in the hospital's intensive care unit in extreme pain, and chest tubes had to be inserted to treat his damaged lung. He stayed in the regular ward of the hospital for two additional days before being released. The victim explained that the bullet is still lodged in his body and displayed his scars from the chest tubes and the gunshot wound to the judge and jury.

On cross-examination, the victim admitted that his attention was on the shooter, but he stated that the maroon Cadillac "peeled tires" and blocked him in a parallel fashion. He admitted that

---

[1]Co-defendant Allen Rick "Cry Baby" Jordan pled guilty to especially aggravated robbery before the trial began, and the other co-defendant, Oswald Nelson, was tried as a juvenile.

-3-

defendant Groomes did not say anything to the gunmen or get out of the car. The victim admitted that he knew Akins's identity from the news but stated that he also remembered Akins's face; however, he could not specifically remember what clothing Akins had on, whether he had on a cap, or whether his hair was long or short on the day of the robbery.

Laura Pierce testified that she had just returned to her van from the mall on August 31, 1997, and was watching the mall entrance for her husband to come out. She noticed a commotion to the left and saw a group of young black men, possibly teenagers, scuffling. As her husband started out of the mall, she heard a "pop." She then saw the victim struggling out from among the group of young men as if trying to get away from them. Ms. Pierce told the court that some of the men got into the blue car, and the victim began yelling that he had been carjacked and shot. Ms. Pierce hesitated momentarily, thinking that this might be a prank, until she saw the massive amount of blood on the victim's shirt. As she walked to the victim in the next aisle, she noticed there was a trail of blood across the parking lot and that the victim's shirt and shoes were covered with blood. As she laid him on the ground, Ms. Pierce saw a hole in the victim's chest and a "fountain of blood" that was squirting out of the hole as his heart pumped. She stated that she realized the victim would bleed to death quickly, so she used his wadded-up shirt to apply pressure on the chest wound and called for help. Ms. Pierce related how the victim asked her if he was going to die and that she prayed for him. After the ambulance came, Ms. Pierce took the victim's cousin to the hospital. She remembered that the blue car left the scene of the shooting and stated that she did not see the maroon car.

David Sutton, another witness at the mall, testified that he was driving northbound on Perimeter Drive toward the Sears at the Cool Springs Mall when he noticed two black males on the opposite side of the median running from a blue car toward a brownish, burgundy Oldsmobile or Cadillac. The blue car was situated slightly behind the burgundy car and was sideways in the street after impacting the curb. Sutton drove past the median and turned around to go back to the scene, but the burgundy car sped away, and the two men were gone. The doors of the blue car had been left open, and the engine was running. He could see that the front tire and wheel of the blue car were virtually destroyed. The witness identified photographs of the victim's blue Cadillac and the defendants' maroon Cadillac as the cars he saw that day. On cross-examination, Sutton admitted that he could not identify any of the individuals he saw.

Highway Patrolman Harold Gooding testified that, on August 31, 1997, he received a "be on the lookout" radio broadcast for a rust or maroon 1985 Cadillac with a temporary tag in the left rear window that was suspected in a carjacking at the mall. Gooding spotted a car on Old Hickory Boulevard matching the description that had been broadcast and notified the dispatcher around 5:00 p.m. of a possible sighting. He turned and followed the vehicle. Gooding followed the car as it made a left turn to go north on Hill Road and then observed it turning right on Woodbridge. Knowing that this was a cul-de-sac and that his backup was on the way, Gooding turned around on Hill Road and waited for the car to emerge from the cul-de-sac. The car appeared less than a minute later and turned south on Hill Road. As the driver made a left on Old Hickory, Gooding stopped the car with his backup present. Initially, he had observed at least two people in the car, but, at the time

of the stop, only the driver, defendant Groomes, was present. A cooperative Groomes was taken into custody, and the suspect and his vehicle were searched.

The search turned up a live 12-gauge shotgun shell in Groomes's right front pocket and a Remington shotgun on the rear floorboard. Gooding took photographs of the shotgun, which he identified at trial, and gave the shotgun shell to Officer Charles Bradley. He also identified two photographs of the maroon Cadillac as the car he stopped. On cross-examination, the trooper admitted that he had given a written statement in which he said that the shotgun shell was found in Groomes's left front pocket rather than the right pocket, as he testified at trial.

The State's next witness was Detective Tommy Heithcock of the Franklin Police Department, through whom a number of exhibits were placed into evidence. Detective Heithcock testified that, on August 31, 1997, around 6:15 p.m., he responded to the scene of defendant Groomes's arrest on Old Hickory Boulevard. He identified the Mossberg 12-gauge shotgun that he found in the backseat of the burgundy Cadillac, photographs that he took of the gun that day, as well as four shotgun shells found in the car and photographs taken of the shells while they were still in the pocket attached to the back of the front passenger seat. All were admitted into evidence. According to Heithcock, the shotgun's safety was off when he found it. The shotgun shell found in Groomes's pocket during the search was given to Heithcock by Officer Bradley, who did not testify at trial. Due to an objection of improper foundation, the single shell was moved into evidence later in the trial through Trooper Gooding.[2]

Detective Heithcock was later called to 5552 Hill Drive in Nashville, where he recovered a .380 Larson semiautomatic handgun that had been discovered approximately 100 yards off Hill Road under some bushes at the home. This was the same area where the burgundy Cadillac had been observed turning into a cul-de-sac, and some of the suspects had gotten out of the car. Heithcock identified photographs of the house and weapon. He testified that the gun was loaded, the safety was off, and there was a spent shell lodged in the chamber which had improperly ejected. The handgun and the rounds found in it, including the spent round, were identified by Heithcock and also moved into evidence.

Detective Heitchcock's inspection of the maroon Cadillac revealed blood on the right rear door handle. Two photographs of the blood spatter were admitted into evidence through Detective Heithcock's testimony. He had also recorded the VIN number of the vehicle on the tow slip the day of the incident and matched that number to a certified copy of the title and registration of the maroon Cadillac showing defendant Groomes as the owner.

The State's next witness was co-defendant Allen Rick "Cry Baby" Jordan, who had already pled guilty. He testified that Cecil Groomes, Terrancé Akins, and Oswald Nelson went to the Cool Springs Mall with him on August 31, 1997, in Groomes's burgundy Cadillac. At the time of trial,

---

[2]The State recalled Trooper Gooding to the stand, who identified the single shotgun shell as the one he took from Groomes and gave to Officer Bradley. The shell and two photographs taken of the shell were entered into evidence.

Groomes and Jordan were nineteen years old, Akins was eighteen, and Nelson was still a juvenile. According to Jordan, they went to the mall to look for an amplifier for Groomes's speakers. When they saw the victim's blue Cadillac, Groomes said, "Look at that ride." After both cars parked, all four occupants of Groomes's car followed the victim and his cousin up to the mall. Jordan testified that he intended to get some money from the men but that his three friends were just going to the mall. Before reaching the mall, the victim turned around and went back to his car. According to Jordan, Groomes saw a closer parking space and asked Jordan to move the car, but Groomes ended up going back to his car as well. Jordan retrieved a handgun from under the front seat of the car and went to the victim's blue Cadillac. He stated that he bought the gun from Akins about a week before the incident. At some point, Akins and Nelson also returned to Groomes's car. As the victim was pulling out of his parking space, Groomes pulled his car in front of the victim's car. Jordan stated that he opened the driver's side door and "drew down on him [the victim]" with the handgun. With Akins behind him holding a shotgun,[3] Jordan ordered the victim to get out of his car, but the victim began kicking him and was accidentally shot. He then pulled the victim out of his car and told Akins to get in the victim's car. With Jordan driving, the two defendants sped away to catch up with Groomes's car, which had already left the scene. As he caught up with Groomes and applied his brakes, Jordan was forced to swerve around Groomes's car and hit the curb. Jordan and Akins ran from the victim's car, jumped into Groomes's burgundy Cadillac, and got back on the interstate. They noticed a state trooper following them, and Jordan, Akins, and Nelson ran from the car after Groomes pulled into a side street off Old Hickory Boulevard. Jordan testified that he left the handgun there. A female eventually helped them check into the Liberty Inn off Trinity Lane. Jordan testified that he and Akins discussed their plans to leave the state.

According to Jordan, there was no discussion among the co-defendants about robbing anyone before the incident. When asked why Groomes had pulled his car in front of the victim's car, Jordan replied that he thought Groomes blocked the victim off so he could not go anywhere. Jordan acknowledged giving a written statement to Franklin Police Detective Ray Dilworth a few days after the shooting that said, "We was going to rob the boy but the situation changed and we ended up carjacking." On cross-examination, Jordan said that the previous statement was not correct. He explained that the defendants did not take the shotgun out of Groomes's car when they fled on foot, because, if they were going to get caught, the shotgun was registered and the pistol was not. Jordan admitted that he is a member of the South 40 Gangster Disciples.

On cross-examination, Jordan stated that it was his idea to rob the victim, and he was the only one that planned the robbery. Jordan testified that, as they were walking toward the mall, he told Groomes that he forgot something and needed to go back to the car. Groomes asked Jordan to move his car closer to the mall, but Jordan gave the keys back to him at the car. Jordan testified that he did not ask Groomes to block the victim's car. He also stated that when he hit the curb and blew out the tires on victim's car, Groomes was forced to stop behind him. When Jordan and Akins jumped into Groomes's car, Jordan still had the gun in his hand and told Groomes to drive.

_____

[3]Jordan testified on redirect that the shotgun was located in the back seat of Groomes's car. He agreed that, after Groomes pulled his car up and blocked the victim's car, Akins had to get out of Groomes's car, get the shotgun out of the backseat, and come to stand behind Jordan at the victim's car.

Jordan also described how both he and Akins had been kicked out of their homes and were staying with Groomes in a townhouse recently vacated by Groomes's mother. Jordan testified that he does not have a high school diploma and felt bad, homeless, left on his own, and was not working at the time of the arrest. He agreed that Akins was under considerable stress at the time. Jordan testified that Akins backed him up with the shotgun during the robbery, but Akins did not know it was a carjacking and did not use the shotgun in any threatening manner or point it at the victim. According to Jordan, Akins seemed surprised and confused after the incident. Jordan expressed remorse for what had happened, because he did not intend for the victim to be shot, and stated that what they did was a mistake. He denied that the defendants followed the victim's car in the mall parking lot or that he asked Akins to back him up.

The next witness to testify was Tjwani (West) Cain, a resident of the Valleybrook Apartments, whom the defendants asked to take them to a hotel. This request did not seem unusual to her, because she knew that Akins's mother had kicked him out of her apartment, but she did not know the defendants had been involved in a crime. After taking them to several hotels that were too expensive, she was able to get them checked into the Liberty Inn Hotel on Trinity Lane. Akins spoke to her about going back to St. Louis, and Jordan wanted to go to Texas. Ms. Cain heard about the carjacking after Labor Day and called the police. On cross-examination, Ms. Cain stated that Akins's hair was long and pulled straight back in a ponytail on the day he came to her apartment.

The lead investigator from the Franklin Police Department, Detective Ray Dilworth, testified next. On August 31, 1997, Dilworth arrived at the Cool Springs Galleria to supervise evidence gathering and witness interviews by the other detectives. The crime scene had already been sequestered, and the patrolmen had located the witnesses. Dilworth personally interviewed one witness and photographed the crime scene, including the blood trail on the ground. He arrested Akins at his mother's Valleybrook apartment three days later on September 3. Dilworth and Detective Hale interviewed Akins at the police station in the presence of his mother. Both Akins and his mother signed a waiver of rights form after Akins was advised of his Miranda rights. Akins subsequently gave the detectives a written statement, which he and his mother signed, about his involvement in the carjacking. Dilworth read the statement to the jury as follows:

> I went on the city. I don't remember. I stopped a while and then continued on to the mall. There I saw two men in a Cadillac. I followed them. They parked and got out and went into the mall. I got out [of] the car and was going to go in the mall. Then I saw one of the man [sic] come out of the mall and went to the car and I started walking back to [the] car[.] [T]he man was driving the car. Cry Baby and I went to the car with the gun and told him to get out. I had no intentions of shooting or killing nobody. I had no intention off [sic] carjacking. All I wanted was some money but back to the story. The man started kicking and saying he's not getting out [of] the car. I'm not sure if that's how the gun went off or not. Then we jump[ed] in the Cadillac and drove off and we hit the car on the curve and jump back into another car and drove back toward the way I live when I got

-7-

to this street and Cry Baby and I jump out. I had no intention of nobody [sic] getting hurt. During the shooting, Cry Baby went up to the car with the hand[gun,] and I went to the car with the shotgun and while we were telling him to get out [of] the car[,] the man was kicking and saying he's not getting out. Then the gun went off. I'm not sure if Cry Baby shot him or not.

On cross-examination, Detective Dilworth stated that Akins's mother had paged him at 10:30 a.m. on September 3 and told him that her son was at her house and that she wanted to turn him over to the police. Detectives Dilworth and Hale took Akins into custody approximately twenty minutes later. The detective agreed that the time between his mother's phone call and their arrival at her home was enough time for Akins to have escaped. He testified that Akins was cooperative during the arrest. Once he and his mother were advised of and waived his rights at the police station, Akins was willing to talk to the detectives and immediately gave a statement.

The last witness for the State was Dr. Tim VanNetta, the Vanderbilt University Medical Center trauma surgeon who treated the victim's gunshot wound in the hospital from August 31 until September 4, 1997. When Dr. VanNetta first saw the victim, he was suffering from a bullet wound that had entered his chest just to the right of his left nipple, traveled behind the breastbone, and penetrated the middle and upper lobes of his right lung. As a result, the victim suffered from a pneumothorax and a hemothorax (collection of air and blood in the chest cavity). The victim's lung was reexpanded, and an ultrasound was performed, which showed no blood around the heart. According to Dr. VanNetta, the bullet just missed the victim's heart, went into the lung, and lodged in the victim's armpit, where it still remained. It was necessary for the doctor to insert two chest tubes in the victim to drain the blood out from around the lung and to make sure that it was not leaking air. It was the doctor's opinion that the victim's injury was life-threatening, and, without the chest tubes, he would have died.

After this testimony, the State rested its case, and the defendants elected not to testify or put on any evidence. Their motions for acquittal were denied by the trial court.

# ANALYSIS

## Transfer of Defendant Akins from Juvenile Court

Because defendant Akins was seventeen years old at the time of the offense, he was taken to juvenile court following his arrest. The State then filed a petition in juvenile court requesting that he be transferred to circuit court to be tried as an adult. A hearing was held on September 25, 1997. The juvenile court judge granted the State's petition after finding reasonable grounds to believe that Akins committed the delinquent act charged, that he was not committable to an institution for the mentally retarded or mentally ill, and that the interests of the community required that Akins be restrained or disciplined. Akins argues that the juvenile court judge erred in granting the transfer to adult court, because the evidence was insufficient to find the three criteria required by Tennessee Code Annotated § 37-1-134(a)(4)(A)-(C) in order to transfer a minor from juvenile court. We disagree.

A child charged with a criminal act is to be treated as an adult if the court finds that there are reasonable grounds to believe that: (1) the child committed the alleged delinquent act; (2) the child is not committable to an institution as retarded or mentally ill; and (3) the interests of the community require that the child be restrained or disciplined. Tenn. Code Ann. § 37-1-134(a)(4)(A)-(C) (1996). In addition, § 37-1-134(b) lists a number of factors that the judge shall consider in deciding whether a juvenile should be treated as an adult. These factors relate to the interests of the community and whether the juvenile is amenable to treatment or rehabilitation through juvenile court rather than restraint or punishment meted out through the adult court, and include:

> (1) The extent and nature of the child's prior delinquency records;
>
> (2) The nature of past treatment efforts and the nature of the child's response thereto;
>
> (3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
>
> (4) Whether the offense was committed in an aggressive and premeditated manner; and
>
> (5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state.

Tenn. Code Ann. § 37-1-134(b)(1)-(5) (1996). This list is by no means exclusive.

On appeal of an order of transfer from juvenile court, we do not decide where the preponderance of the evidence lies, but whether there were reasonable grounds for the juvenile court judge to believe that the three criteria of § 37-1-134(a)(4)(A)-(C) mentioned above were present. See State v. Strickland, 532 S.W.2d 912, 920 (Tenn. 1975), appeal dismissed, 425 U.S. 929, 96 S. Ct. 1657, 48 L. Ed. 2d 170, cert. denied, 429 U.S. 805, 97 S. Ct. 38, 50 L. Ed. 2d 65 (1976); State v. Layne, 546 S.W.2d 220, 224 (Tenn. Ct. App.), cert. denied (Tenn. 1976). In other words, if there was probable cause to believe that the juvenile committed the crime and the evidence at the hearing showed that the defendant was not mentally impaired and should be legally restrained, a juvenile court judge's discretionary decision to allow a juvenile to be treated as an adult should not be disturbed on appeal. See State v. Orange, 543 S.W.2d 344, 346-47 (Tenn. Ct. App.), cert. denied (Tenn. 1976).

The juvenile court judge, in making his ruling to transfer Akins to adult court, stated:

> These are extraordinary proceedings. Sending a juvenile, sending a child to adult court is an extraordinary proceeding and there's a very difficult burden placed on the state in establishing the criteria under which we would do that. Looking at those criteria one by one, I think it's pretty clear that this child did commit this delinquent act. I think it's pretty clear that this child is not mentally retarded. He's very articulate, he speaks well. I think he has potential. I hope before his young life is entirely over that that potential can be channeled and developed and turned around. But he's certainly not a young man who's committable for an institution for the mentally retarded or the mentally ill.
>
> Do the interest[s] of the community require that he be put under restraint or discipline? I think that's pretty clear that they do. Looking at the factors involved, it's true that his prior record is not as extensive as some other young men that we see in juvenile court, but he does have a prior record and he's been on probation . . . I think the past treatment efforts, the only ones we heard about were pretty incomplete, pretty sketchy. I don't think he's had a whole lot of a chance. I think maybe at age twelve if the courts and the system in Wisconsin had been able to get a hold of him and do something other than putting him on probation, maybe they could've headed some of this off, I don't know.
>
> A heinous offense. It was not against property, although it started out to be a theft, but Mr. Puckett was shot, nearly killed, and I think the thing that sticks in my mind and makes this more certain for me is that nobody, none of these four guys – it's true, Mr. Plummer, that Mr. Akins had a shotgun and didn't shoot him again, and I suppose that militates in his favor, but he also didn't help him. He didn't put

the gun down and say, "My God, guys, what have we done? Let's get help for this young man, he's bleeding to death on the pavement." No, he grabbed the gun, jumped in the car and took off.

And I don't know about the possible rehabilitation by use of the procedures, services and facilities currently available to this court. I'm afraid that – he's going to turn eighteen in November, between now and his nineteenth birthday, I don't believe that there's much likelihood that we're going to be able to turn this young man around.

. . . .

And so I am granting the petition of the district attorney and I'm transferring this case, jurisdiction of this case, to the Circuit Court of Williamson County. . . .

It is clear from the judge's ruling that he considered the appropriate factors and made the required findings in transferring Akins from juvenile court. The evidence presented at the hearing was sufficient to give the juvenile court judge reasonable grounds to believe that Akins committed especially aggravated robbery.[4] The victim testified about the events surrounding Akins's participation in the carjacking with the shotgun and Akins's escape in the victim's car after Jordan shot the victim in the chest. In the statement given to Detective Hale, Akins described how he, defendant Groomes, Harris, and Jordan followed the victim's Cadillac in the mall parking lot, where Groomes blocked the victim's exit from the parking space. Akins admitted to Detective Hale that he was one of the gunmen who ordered the victim out of his car in order to rob him of his money. After the victim was shot, Akins admitted in his statement to jumping into the victim's car and leaving the scene. Akins's own testimony at the hearing showed that he "just went with it [walking up to the victim's car with a gun] . . . just did it . . . I know now that I should not have." He admitted that he wanted the victim's money and that he and his friends had discussed robbing the victim prior to doing so. Once Jordan had approached the victim with Akins's handgun, Akins made the decision to return to Groomes's car and get a shotgun from the backseat. Akins's participation in the crime is virtually undisputed.

The record likewise supports the judge's ruling that Akins was not mentally ill or retarded. There was testimony from his high school guidance counselor, the school librarian, his former English teacher, his employer at Valvoline Instant Oil Change, and his mother. Nothing in any of this testimony showed that Akins was committable to an institution for the mentally impaired. In addition, Akins's and his mother's testimony at the hearing showed him to be a confused young man who has had an extremely difficult upbringing, but not one with a committable illness. It was

---

[4]Especially aggravated robbery is committed when: (1) a person commits an intentional or knowing theft of property from the person of another by violence or putting the person in fear; (2) accomplished with a deadly weapon; and (3) the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a).

reasonable for the juvenile court judge to believe that Akins was not committable to a mental institution.

Finally, the record supports the judge's finding that it is in the best interests of the community for Akins to be tried as an adult. Akins's delinquent activities began at age twelve, when he got involved with stealing cars, smoking marijuana, and drinking alcohol. In addition, his current offense was a violent and heinous act against a person, which is given more weight by the statute. The victim described the near fatal injuries he received, as well as the sleeplessness and soreness he was still suffering at the time of the hearing. The bullet still remains in his body, which bears the scars of the gunshot and tubes that had to be inserted in his side for a punctured lung. Akins himself testified that he left the scene of the crime to elude capture, not knowing if the victim was dead or alive and without attempting to assist the victim in any way. He also testified that he was planning to flee to another state. Detective Allen Hale testified that Akins hid out for three days after the shooting and turned himself in only after Jordan was arrested on September 3 because he was left alone.

It is also disturbing that Akins does not seem to have learned much of a lesson from his brush with the law at age twelve. He testified at the hearing that he was fired from a job at Wal-Mart for giving a friend free merchandise less than a year before he was involved in this violent crime. The defendant's choice of friends and decision to drop out of school show extremely poor judgment. The juvenile court judge also expressed concern that there was not enough time at the defendant's age for him to be rehabilitated through any programs available to juveniles. Akins had his eighteenth birthday two months after the hearing. The record supports the judge's reasonable belief that it was in the interest of the community that Akins be restrained or disciplined by the adult court.

Since all three statutory criteria were met, we affirm the juvenile court judge's decision to transfer Akins to adult court. This issue is without merit.

### Batson Violation

The defendants argue that the only African-American left in the venire was excused when the State exercised a pretextual peremptory challenge in violation of the defendants' equal protection rights under Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). All other jurors were white, and the defendants are both African-American. After a careful review of the record and applicable law, we affirm the judgment of the trial court in allowing the juror to be excused.

During the jury selection process, the State excused juror Danita Amos, over the defendants' objections.[5] In a jury-out conference, the prosecutor gave three reasons why he wanted to strike Amos: (1) she indicated on the juror questionnaire that she had a relative who was charged with a

---

[5]Following the challenge to Danita Amos by the State, the court said to the prosecutor, "This is not the only case where you have dismissed the only black juror." Matters then proceeded as set out in this opinion.

crime or had been the subject of a criminal investigation; (2) she indicated that she considers herself to be politically slightly liberal; and (3) she indicated that, if she was a lawyer in this case, she would want to know how a juror felt about blacks and crime, their thoughts about blacks, and whether they had ever been robbed by a black person. Both defendants objected to the reasons as pretextual. The prosecutor explained to the judge that he was planning to also strike a white juror, Mr. Bradford, because he had also indicated that he was slightly liberal.[6] Since the judge could not tell what relationship the juror had with the relative charged with a crime, an individual voir dire was conducted with Ms. Amos. The relative turned out to be her brother, and the trial judge eventually allowed Amos to be excused.

The defendants allege that two white members of the jury indicated on their questionnaires that they also had brothers accused or convicted of crimes but were not excused; therefore, the State's neutral reason for the peremptory challenge is not valid. In the record, we have the affidavit of juror Linda Suggs stating that she had indicated on her juror questionnaire that her brother had been convicted of a crime. The State argues that the defendants could have asked questions of juror Suggs during voir dire about her brother's conviction but chose not to. It defends the race-neutral reasons given the trial court for excusing Amos.

In Batson v. Kentucky, the Court held that it is a violation of a defendant's equal protection rights for the State to exclude all members of the defendant's race from the jury on account of race. Batson, 476 U.S. at 89; Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 902 (Tenn. 1996). To challenge a peremptory strike as a Batson violation, the defendant must establish a prima facie case of purposeful discrimination. Batson, 476 U.S. at 96; Woodson, 916 S.W.2d at 902. The defendant must show that he is a member of a cognizable racial group, that the prosecutor exercised a peremptory challenge to remove members of his race from the jury, and that all the relevant facts point to an inference of a discriminatory purpose. Batson, 476 U.S. at 96; State v. Brown, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995). A defendant may show such a discriminatory purpose with evidence of systematic racial exclusion by the prosecution, a venire that is substantially underrepresented by that racial group, or the particular selection methods and results of the present case, such as questions and statements made during voir dire. Woodson, 916 S.W.2d at 902, 904. In addition, the defendant is allowed to rely on the presumption that the nature of a peremptory challenge itself allows one who wants to discriminate to do so. Batson, 476 U.S. at 96; Woodson, 916 S.W.2d at 902.

Once the defendant makes such a prima facie showing, the burden shifts to the State to demonstrate a neutral reason for excluding the potential juror. Batson, 476 U.S. at 97; Woodson, 916 S.W.2d at 903. The racially-neutral reason does not have to be plausible or persuasive; it just cannot be a reason that denies equal protection. Purkett v. Elem, 514 U.S. 765, 768-69, 115 S. Ct. 1769, 1771, 131 L. Ed. 2d 834 (1995) (long, unkept hair, mustache, and beard are sufficient racially-neutral reasons to strike black juror). The defendant then must be given the opportunity to show that the reason given is pretextual or inadequate. Woodson, 916 S.W.2d at 904. After hearing all of the

---

[6]Mr. Bradford, a white juror, was subsequently stricken from the jury.

relevant facts, the trial court must determine whether purposeful racial discrimination has been demonstrated based on a totality of the circumstances. See id.

In reviewing the facts surrounding the exclusion of Amos from the jury, we must be mindful of the proper use of peremptory strikes. It is permissible for parties to use their peremptory strikes to eliminate those jurors who are sympathetic to the opposing side, as well as those who are the most extreme in their perceived biases toward the striking party's position. State v. Turner, 879 S.W.2d 819, 821 (Tenn. 1994) (citing Swain v. Alabama, 380 U.S. 202, 218-20, 85 S. Ct. 824, 831-35, 13 L. Ed. 2d 759) (1965), and Holland v. Illinois, 493 U.S. 474, 484, 110 S. Ct. 803, 809, 107 L Ed. 2d 905 (1990)). "Peremptory strikes, by definition, may be exercised for any reason unless that reason is specifically prohibited by legislation or by judicial decision." Turner, 879 S.W.2d at 821. In addition, a determination of whether the prosecutor's intent in exercising a peremptory strike is discriminatory turns largely on the prosecutor's credibility, which can best be gauged by his demeanor. Batson, 476 U.S. at 98 n.21; State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994); State v. Ellison, 841 S.W.2d 824, 827 (Tenn. 1992). Therefore, the trial court's decision as to whether the challenged strike is permissible is given great deference on appeal and will not be set aside unless clearly erroneous. Woodson, 916 S.W.2d at 906. Since an attorney is allowed to rely on "gut instinct" and experience in choosing a jury that is the most favorable to his or her side, excluding one juror for having a relative convicted of a crime and not excluding another is not necessarily improper. Many factors and circumstances go into an attorney's concept of whether a juror is favorable to his side or not, and the attorney's judgment is acceptable unless motivated solely by race. We find nothing in the case law that requires the prosecution to pick one factor, such as having a relative involved in a crime, and exclude every single juror who has that factor, regardless of whether the attorney's gut feeling is that the particular juror would be favorable to his side. See generally, Kelly v. Withrow, 25 F.3d 363, 367-68 (6th Cir. 1994); United States v. Valley, 928 F.2d 130, 135-36 (5th Cir. 1991).

Our review of the record regarding the trial court's exclusion of Amos and the retention of Linda Suggs[7] as a juror reveals no error. The trial judge was very careful in his consideration of the peremptory challenge of Amos by the prosecution and conducted an individual voir dire to explore the prosecution's race-neutral reasons. Amos told the judge that her half-brother was involved in an ongoing legal battle after being convicted of selling drugs. When asked about her answers related to race, Amos expressed her opinion that race has a bearing on the outcome of a trial, in that a white juror may convict a defendant just because he is black. The judge was satisfied that the close relationship of Amos to her brother's conviction was sufficient to exercise the peremptory challenge and excused her. The only other black juror, Ms. Flowers, was excused for cause without objection.

The defendants never raised any questions at trial about juror Linda Suggs, who also indicated on the questionnaire that her brother had a conviction. An individual voir dire was also

_____

[7]In his brief, defendant Groomes also challenges the fact that a white juror, Donna Casey, indicated on the juror questionnaire that her brother was accused of vandalizing a car but was not stricken from the jury by the prosecution. No objection was made by the defendant. Thus, we have nothing in the record to review in relation to this claim and decline to address it.

conducted with Suggs as one of the jurors who indicated that she had heard about the case from the media or other outside sources. She subsequently served on the jury. In her affidavit filed with Groomes's post-trial motion, Suggs stated that she did not know much about the charge against her brother, other than the conviction was in Texas and was related to possession of drugs.

Since the prosecution articulated race-neutral reasons for striking Amos, the burden of proof shifted back to the defendants to show purposeful discrimination. See Purkett, 514 U.S. at 768. The defendants have not carried that burden. We are satisfied that the trial judge used his discretion properly in allowing the prosecution to peremptorily strike Amos and that no constitutional violation occurred.

## Prosecutor's Closing Argument

The defendants allege that the prosecutor made prejudicial and improper statements in his closing argument. Groomes argues that the prosecutor's references to the defendants' actions in the present case being consistent with their characters, statements urging the jury to vindicate the victim, and references to making the mall safe for everyone were reversible error. The State argues that Groomes waived his objection to statements regarding deterrence, since he did not object at trial, and any improper statements were harmless error. Akins objected to the comments on the defendants' character at trial. After careful review, we conclude that any improper statements by the prosecution were harmless error.

Wide latitude is given to both the prosecution and defense during closing argument and is subject to the trial court's discretion. State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). However, closing arguments should be based on the evidence presented and not be improper under either the facts or the law. Id. Where the argument is found to be improper, we must decide if the improper remarks prejudiced the defendant by affecting the verdict. Id. at 559. In making such a determination, the following factors are considered: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Id. at 560.

Statements of the prosecutor regarding the current actions of each defendant being consistent with his character were improper, unless the defendants opened the door to their own characters. It may be that Akins cracked open that door in his cross-examination of Jordan by eliciting responses that Akins was still working, even though he was homeless and had to walk to work, and how surprised and confused he was after Jordan shot the victim. Akins elicited responses from Detective Dilworth that Akins stated that he was "lost and confused," that he did not escape after Dilworth was called to come to his mother's house, that he was polite and cooperative during the arrest, and that he was concerned about the victim's condition. Jordan also testified at trial that he was a gang member, but Akins was not. This testimony appears to have been intended to show that the robbery was not consistent with Akins's character. But, in any event, in view of the judge's instruction to the jury that statements of counsel are not evidence and in light of the strength of the

case against both defendants, we find no prejudice to the defendants or effect on the verdict from these statements. See State v. Tyson, 603 S.W.2d 748, 754 (Tenn. Crim. App.), perm. app. denied (Tenn. 1980) (reference to defendants as rats improper but harmless error). This error was harmless.

Likewise, the prosecutor's statements that the jurors "cannot condone this activity in our county," "set the standard for how safe our county is," and "have to let these individuals know . . . you can't do that in a civilized society" basically asked the jurors to be the conscience of the community with their verdict. It is not necessarily improper for the prosecutor to appeal to the jury to be the conscience of the community. State v. Patterson, 966 S.W.2d 435, 446 (Tenn. Crim. App. 1997); State v. Pulliam, 950 S.W.2d 360, 368 (Tenn. Crim. App. 1996), perm. app. denied (Tenn. 1997). However, the prosecutor also made statements that border on asking the jury to deter future crimes with their verdict, which was improper:

> People at the mall have a right to be free from crime. They have a right to go there and shop and to enjoy life without having this thing shoved in their chest. They have a right to that, and I ask you. . . I ask you, Ladies and Gentlemen, on behalf of the people of the State of Tennessee, to find these two people guilty of what they have been indicted for, which is especially aggravated robbery.

The prosecutor could have replaced "people" with the victim's name and comported with the evidence, so we do not find these remarks to be so prejudicial or inflammatory to have affected the verdict. The trial judge also instructed the jury to disregard statements of counsel that did not comport with the evidence presented, and the jury is presumed to have followed the judge's instructions. See State v. Carter, 988 S.W.2d 145, 152 (Tenn. 1999); State v. Brewer, 932 S.W.2d 1, 27 (Tenn. Crim. App.), perm. app. denied (Tenn. 1996). This error is harmless.

### Sufficiency of the Evidence

Defendant Groomes asserts that the evidence at trial was insufficient to sustain a guilty verdict against him for especially aggravated robbery. The defendant is initially cloaked with a presumption of innocence, but this presumption is lost following a jury verdict. Thus, on appeal, the defendant has the burden to prove that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). We must affirm the conviction, unless the evidence at trial was so deficient that no rational trier of fact could have found all of the essential elements of the convicting crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994). This applies to convictions based on either direct or circumstantial evidence or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App.), perm. app. denied (Tenn. 1990). In determining the sufficiency of the evidence, we do not reweigh the evidence or substitute our own inferences for those of the jury. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). In addition, we give the strongest legitimate view of the evidence and all reasonable inferences to the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S. Ct. 1368, 122 L. Ed. 2d 746 (1993). With these principles in mind, we turn to the evidence.

The defendant was convicted of especially aggravated robbery, which is defined in Tennessee Code Annotated § 39-13-403 as robbery: (1) accomplished with a deadly weapon; and (2) where the victim suffers serious bodily injury. Robbery is defined in Tennessee Code Annotated § 39-13-401 as: (a) the intentional or knowing theft of property from the person of another by violence or putting the person in fear.

At trial, there was a plethora of evidence supporting Groomes's conviction. The victim described in detail how the defendants followed him, were looking at his car, and how Groomes blocked his car while Jordan and Akins robbed him. There is no doubt that the victim suffered a painful and life-threatening injury from being shot point-blank in the chest. The victim's testimony, as well as that of Laura Pierce and Dr. VanNetta, was sufficient for the jury to find that Groomes, as well as Akins, meant to rob the victim, who sustained serious bodily injury as a result. The testimony is undisputed that Akins and Jordan took the victim's car in the robbery. The testimony from Jordan about the shooting and flight, the testimony from Trooper Gooding and the Franklin police officers involved in the arrest of Groomes and Akins, and the testimony of Tjwani Cain, who helped the defendants rent a hotel room to hide out, further supported the essential elements of the offense and allowed the jury to infer guilt from the defendants' flight. The jury simply did not believe Groomes's story that he was just backing out his car to move it to a closer parking space and was not involved in the robbery. There is no merit to this issue.

### Serious Bodily Injury and Lesser Offense of Carjacking

Defendant Akins next argues that the trial judge erred in taking the issue of serious bodily injury away from the jury by only giving instructions on especially aggravated robbery and facilitation of especially aggravated robbery, which both require serious bodily injury to the victim. This is actually a challenge to the court's decision not to instruct on "bodily injury" or on the lesser offense of carjacking, which does not include serious bodily injury to the victim. In addition, defendant Groomes argues that the trial court erred by not giving an instruction on aggravated robbery, robbery, carjacking, and an attempt to commit these offenses. The State argues that the jury was instructed on all elements of especially aggravated robbery, including serious bodily injury, and that an instruction on the lesser offenses was not required. We agree with the State and conclude that the judge was not required to give an instruction on "bodily injury" or any of the other offenses listed. This issue is without merit.

The judge charged the jury as follows:

> For you to find the defendant guilty of this offense [especially aggravated robbery], the state must have proven beyond a reasonable doubt the existence of each of the following essential elements:
> . . . .
>
> (6) that the alleged victim suffered serious bodily injury.
>
> . . . .

-17-

"Serious bodily injury" means bodily injury which involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty.

The judge also gave an instruction on facilitation of especially aggravated robbery, which also requires that the victim suffer serious bodily injury. There was no doubt from the trial court's instruction that the jury was required to find that the victim sustained serious bodily injury under the legal definition beyond a reasonable doubt in order to return a guilty verdict, which they did.

Thus, as to both defendants, the trial court instructed as to especially aggravated robbery, a Class A felony, and facilitation of especially aggravated robbery, a Class B felony. Both defendants argue that the court should have also instructed as to carjacking, a Class B felony. Additionally, Groomes claims that the jury should have been instructed as to aggravated robbery, a Class B felony, robbery, a Class C felony, and the attempt to commit each of these offenses, which is one classification below the most serious crime attempted.

We will now consider whether it was error for the court not to have instructed as to the additional offenses set out by the defendants. By statute, a trial court is required to instruct on any lesser-included offenses that are supported by the evidence at trial, regardless of whether any request is made. Tenn. Code Ann. § 40-18-110; State v. Eric Flemming, No. M1997-0073-SC-R11-CD, 2000 WL 520933 (Tenn. Apr. 3, 2000); State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999); Elder, 982 S.W.2d at 876-77. Our supreme court has recently given us a step-by-step analysis for determining when an instruction is required on a lesser-included offense. At the same time, the court also overruled the language in State v. Trusty, 919 S.W.2d 305 (Tenn. 1996), that made a distinction between lesser "grades" and "lesser-included" offenses, which was causing much confusion in our courts. Burns, 6 S.W.3d at 464-65; State v. Dominy, 6 S.W.3d 472, 477 (Tenn. 1999).

Under Burns, trial courts must now engage in a two-step process that: (1) requires the court to determine whether the offense in question fits the Burns court's definition of a lesser-included offense,[8] and, if the answer to step one is "yes," then (2) the court must determine if the evidence

---

[8] An offense is a lesser-included offense if:

    (a)    all of its statutory elements are included within the statutory elements of the offense charged; or

    (b)    it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
       (1)    a different mental state indicating a lesser kind of culpability; and/or
       (2)    a less serious harm or risk of harm to the same person, property or public interest; or

    (c)    it consists of

(continued...)

supports an instruction on that lesser offense. <u>Burns</u>, 6 S.W.3d at 467. If the answer to step one is "no," then an instruction is not required, even if the evidence warrants one. <u>Id</u>.

Robbery is defined in Tennessee Code Annotated § 39-13-401(a) as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."

Aggravated robbery is defined in Tennessee Code Annotated § 39-13-402 as robbery plus:

  (1)  Accomplished with a deadly weapon or by display of any
       article used or fashioned to lead the victim to reasonably
       believe it to be a deadly weapon; **or**

  (2) Where the victim suffers serious bodily injury. (emphasis added)

Especially aggravated robbery is defined in § 39-13-403(a) as robbery:

  (1) Accomplished with a deadly weapon; **and**

  (2) Where the victim suffers serious bodily injury. (emphasis added)

Finally, carjacking is defined by § 39-13-404 as:

  (a)  the intentional or knowing taking of a motor vehicle from
       the possession of another by use of:

    (1) A deadly weapon; or

    (2) Force or intimidation.

Applying the first step of the <u>Burns</u> analysis, we conclude that carjacking is not a lesser-included offense of especially aggravated robbery, since it has an essential element, the taking of a motor vehicle, that is not present in the offense charged. Thus, the trial court was correct not to instruct on carjacking.

---

[8](...continued)

  (1)  facilitation of the offense charged or of an offense that otherwise meets the
       definition of lesser-included offense in part (a) or (b); or
  (2)  an attempt to commit the offense charged or an offense that otherwise meets the
       definition of lesser-included offense in part (a) or (b); or
  (3)  solicitation to commit the offense charged or an offense that otherwise meets the
       definition of lesser-included offense in part (a) or (b).

<u>Burns</u>, 6 S.W.3d at 466-67.

Aggravated robbery, robbery, and an attempt to commit these offenses all fall under the Burns definition of lesser-included offenses, but that is not where our inquiry ends. We must decide if the evidence at trial warranted an instruction on these offenses under the second step of the Burns analysis. In completing this step, we must view the evidence in the light most favorable to the lesser-included offense, without making judgments on the credibility of witnesses or evidence, and determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. Next, we must determine if the evidence, when viewed in this light, is legally sufficient to support a conviction on the lesser offense. Burns, 6 S.W.3d at 469.

There were a number of undisputed facts in this case: the victim had a life-threatening injury; Jordan was the shooter; Akins held a shotgun and stood behind Jordan during the robbery; Groomes's car blocked the victim's car from backing out; Jordan and Akins took the victim's car and wrecked it; all of the defendants fled the scene; and Jordan and Akins hid out for three days before being captured. However, there are three scenarios that the rest of the evidence could have raised. First, there is the victim's version that the defendants followed him and acted in concert to rob him. This is also supported by statements made by Akins and Jordan to police that the four defendants followed the victim and planned to rob him. Second, there is the version raised by Akins, through his questioning of witnesses, that the defendants had no plans to rob the victim and that Akins just went along with Jordan without having any intent to take the victim's car or to shoot him. A third version was raised by Groomes through cross-examination, that the defendants had gone to the mall to buy an amplifier, that he did not know what Jordan had planned to do, and that he was simply backing his car out to move it to a closer parking space when he blocked the victim's car. He left the scene when he realized what Jordan was doing. However, he allowed Jordan and Akins to flee in his car because he was forced to stop when the victim's car hit the curb, and Jordan still had a gun in his hand when he approached Groomes's car. Coupled with the undisputed facts, we conclude that the only evidence presented that a reasonable mind could accept was especially aggravated robbery as to all three defendants (version 1), facilitation of a felony[9] (version 2 or 3), or acquittal. There was no evidence that reasonable minds could accept that the victim did not incur serious bodily injury or that the robbery was accomplished without a deadly weapon. Both elements were undisputably present, so there was no need to instruct on aggravated robbery or simple robbery. The jury simply did not believe the defendants' versions and found them guilty of the greater charge rather than merely facilitation of Jordan's robbery.

Likewise, an instruction for attempted especially aggravated robbery was not required. Even though this meets the exception of Burns as a lesser-included offense, there was no evidence that reasonable minds could accept that either Akins or Groomes acted with the intent necessary for especially aggravated robbery but merely went beyond mere preparation toward the commission of the robbery or intentionally engaged in conduct designed to rob the victim, but that the crime was

---

[9] Facilitation of a felony under Tennessee Code Annotated § 39-11-403(a) (1997) makes a defendant criminally responsible if, "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony."

-20-

not completed.  See Tenn. Code Ann. § 39-12-101.  Thus, no instruction was required on attempt.

Additionally, we note that the jury was instructed both as to especially aggravated robbery, a Class A felony, and facilitation of this offense, a Class B felony, and that both defendants were convicted of the Class A felony.  Thus, the jury having been instructed as to a Class B felony, and having convicted the defendants of the Class A felony, it would have been harmless error for the trial court not to have instructed as to the additional offenses claimed by the defendants had such instructions been warranted.  State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998).  In Williams, our supreme court said:

> Reversal is required if the error affirmatively appears to have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice.

Id. (citation omitted).

Thus, even if there should have been an instruction as to these additional offenses, it does not affirmatively appear that such alleged error affected the results of the trial or that it more probably than not affected the judgment to the defendants' prejudice.  Thus, for this additional reason, this assignment of error is without merit.

### Improper Contact with Jurors

Defendant Groomes asserts that the verdict against him is tainted, because jurors had improper conversations with the victim's family, and that he is entitled to a new trial.  The State argues that Groomes has not shown any prejudice from any alleged contacts.  After a careful review of the record, we affirm the trial court's denial of Groomes's motion for new trial.

Communication about the case with a non-juror third party is one type of external influence that could warrant a new trial if it is also found to be prejudicial.  Caldararo v. Vanderbilt Univ., 794 S.W.2d 738, 742 (Tenn. Ct. App.), perm. app. denied (Tenn. 1990).  When a jury is not sequestered, the defendant has the burden of showing more than mere interactions between jurors and third parties to shift the burden to the prosecution to show that no prejudice to the defendant occurred.  The defendant must show that extraneous prejudicial information or some outside improper influence was imparted to one or more jurors.  State v. Blackwell, 664 S.W.2d 686, 689 (Tenn. 1984); State v. Clinton, 754 S.W.2d 100, 103 (Tenn. Crim. App.), perm. app. denied (Tenn. 1988).

In support of his allegations of improper jury contact at the hearing on his motion for a new trial, Groomes offered the affidavits, as well as the testimony, of his mother and sister stating that they overheard the victim discussing the facts of the case with two female jurors, one of whom was blonde and pregnant.  In their testimony at the motion hearing, neither woman was able to identify a specific juror that had improper contact with witnesses.  Two jurors, Chantelle Smith and Linda Kelly, were brought to court on the day of the motion hearing to meet Ms. Groomes and her

daughter, because they most closely matched the descriptions in the Groomes's affidavits of jurors who had conversations with the victim and his family during the jury selection process. Linda Kelly was not the juror either woman remembered, and Ms. Smith testified at the hearing that she was pregnant at the time of trial but did not have a conversation with the victim or his family. She was also not a blonde. Her only conversation was with a woman identified as Ann Sleigh, who had asked the younger Ms. Groomes what her jury number was. When Ms. Groomes answered that she was the defendant's sister, the woman patted her and said, "Oh, bless your heart. I'm so sorry." Ms. Sleigh had related this story to Chantelle Smith but was later stricken from the jury by defendant Groomes.

Joe Burns, a transportation deputy with the sheriff's department, also testified at the hearing on Groomes's motion for a new trial. He testified that he saw an older man with the victim pointing toward the two defendants and mouthing profanity during a courtroom break. Deputy Burns did not know if any jurors were present in the courtroom during this time, and the man was excluded from the courtroom by the judge.

In reviewing the record, we find no indication that any members of the jury panel that decided this case were involved in any improper, prejudicial communications. At the end of the jury selection process, a male jury panel member, Richard Coles, Jr., notified the judge that he had heard witnesses discussing the case and pointing out defendant Akins. The judge excused Mr. Coles and questioned the entire panel as to whether any other jurors had overheard conversations about the case. None of the jurors responded in the affirmative. At that point, three jurors were stricken by the parties, and alternates were picked. Defense attorneys could have questioned the two unidentified women from the Groomes's affidavits or any of the other jurors about contact with third parties if a problem were perceived. In fact, in her brief, Groomes's counsel alleges that she observed the victim talking to a jury panel member during the selection process, but there is nothing in the record to show that she pursued this with the jurors during voir dire. We conclude that the defendant has failed to show that there were improper communications between any member of the jury panel and a non-juror third party or that the outcome of the trial was affected by any alleged communications. This issue is without merit.

**Sentencing Factors**

In reviewing a sentence, we conduct a *de novo* review with a presumption of correctness of the trial court's findings. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). We conclude that the trial court properly considered the appropriate factors, and the presumption of correctness applies.

In conducting our *de novo* review of the sentences, we must consider: (1) the evidence received at trial and at the sentencing hearing; (2) the presentence report; (3) sentencing principles; (4) arguments for sentencing alternatives; (5) the nature and characteristics of the criminal conduct involved; (6) any mitigating and enhancing factors; (7) the defendant's statements regarding sentencing; and (8) the defendant's potential, or lack thereof, for rehabilitation or treatment. Tenn. Code Ann. § § 40-35-102, -103, -210 (1997); State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

**A. Cecil Groomes**

Defendant Groomes argues that his sentence of twenty-two years is excessive and that the trial court erred in not applying additional mitigating factors to his case, which would reduce his sentence to twenty years. We disagree and conclude that the defendant was properly sentenced by the trial court.

Because especially aggravated robbery is a Class A felony, the trial judge began sentencing using the midpoint of twenty years. Tenn. Code Ann. § 40-35-210(c) (1997); State v. Chance, 952 S.W.2d 848, 851 (Tenn. Crim. App. 1997). He applied three enhancing factors set out in Tennessee Code Annotated § 40-35-114: (1) the defendant had a prior criminal history of a misdemeanor conviction for possession of a gun and a felony conviction for possession of pipe bombs;[10] (13) the defendant committed the current offense while on probation for the felony; (21) the defendant deceived the court in his affidavit of indigency and failed to pay the administrative fee. The trial judge then applied three mitigating factors set out in § 40-35-113: (4) the defendant played a minor role in the offense; (6) because of his youth, the defendant lacked substantial judgment in the commission of the offense; and (9) the defendant assisted authorities in apprehending the other defendants.

We conclude that the trial court properly considered the enhancing and mitigating factors in reaching the twenty-two-year sentence. Testimony was presented at the sentencing hearing that Groomes had assets that he did not divulge to the court in procuring court-appointed counsel and did not pay his administrative fee. Groomes gave testimony that showed he has been involved in fights

---

[10]Probation Officer David Pratt testified at the sentencing hearing that Groomes pled guilty to these offenses on July 14, 1997, and was out on bond approximately one month when the current offense occurred. He was sentenced on September 4, 1997, for the weapons and pipe bomb charges.

in the jail and at school, as well as convicted of prior criminal offenses. In addition, there was testimony that the defendants were involved in another shooting incident earlier in the day of the carjacking. The trial judge apparently weighed the enhancing factors heavily, and we presume his findings to be correct.

Groomes further argues that the court failed to apply mitigating factor (1), because his conduct neither caused nor threatened serious bodily injury. We cannot agree. Groomes was armed that day, and it was his shotgun that Akins used in the robbery. The victim sustained a life-threatening injury as a result. The trial court did not err in refusing to apply this factor.

Groomes also claims that mitigating factor (11) should have been applied, in that he committed this offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his conduct. In light of the evidence presented that he was involved earlier that day in another shooting incident and continued to go armed with the other defendants, we conclude that the trial court correctly refused to apply this factor. Groomes was properly sentenced, and we affirm the trial court's findings.

### B. Terrancé Akins

Akins argues that he should have been sentenced as an especially mitigated offender. He further argues that the trial court failed to apply three other mitigating factors: (3) substantial grounds exist to justify the defendant's conduct; (4) the defendant played a minor role in the offense; and (11) the offense was committed under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his conduct. Tenn. Code Ann. § 40-35-113. In setting this defendant's twenty-year sentence, the trial judge applied one enhancing factor, the defendant had a previous juvenile conviction for auto theft that would be a felony if committed by an adult (factor 20), and one mitigating factor, his youth caused him to lack substantial judgment in committing this offense (factor 6).

As to enhancing factor (20), Akins argues that there was no valuation of the vehicle involved in the juvenile car theft conviction, so the court had no evidence that this would be considered a felony rather than a misdemeanor. As provided by Tennessee Code Annotated § 39-14-105(1), a theft of property under $500 is a Class A misdemeanor. Juvenile offenses occurring after July 1, 1995, can be considered only if they qualify under Tenn. Code Ann. § 40-35-114(20), which requires that, for consideration, a juvenile offense must be such that, if committed by an adult, it would be a felony. See State v. Glynnon Bradshaw, No. 01C01-9810-CR-00439, 1999 WL 737871, at *2 (Tenn. Crim. App., Nashville, Sept. 22, 1999); State v. Jeffery Ray Jennings, No. E1999-00848-CCA-R3-CD, 2000 WL 274078, at *4 (Tenn. Crim. App., Knoxville, Mar. 14, 2000). Thus, since there was no proof presented as to the value of the vehicle stolen, we agree that factor (20) did not permit this conviction to be considered for enhancement purposes. Accordingly, there were no applicable enhancing factors.

The additional mitigating factors that Akins asks us to apply fly in the face of the testimony at trial and the sentencing hearing. Not only was Akins one of the gunmen in the robbery, he was with the other defendants earlier in the day when Jordan fired the shotgun out of the car window at another motorist on the freeway. In addition, there was testimony from several witnesses that Akins was working at the time of the offense, but in his statement given to police, he stated that he wanted to take money from the victim. The fact that he was put out of his house and could not graduate from high school on time is no excuse for committing such a violent crime. It was his choice not to remain in school so that he could live at home. The trial judge already took into account his poor youthful judgment as a mitigating factor, and we cannot disagree with the court's refusal to apply other mitigating factors.

Thus, as to defendant Akins, it appears that there were no enhancing factors and that the trial court could have considered him as an especially mitigated offender. However, it was discretionary with the trial court as to whether to do so. See Tenn. Code Ann. § 40-35-109(a) ("The court *may* find the defendant is an especially mitigated offender, if: (1) The defendant has no prior felony convictions; and (2) The court finds mitigating, but no enhancing factors.") (emphasis added); State v. Braden, 867 S.W.2d 750, 762-63 (Tenn. Crim. App.), perm. app denied (Tenn. 1993) (It is within the "sound discretion" of the trial court whether a defendant should be sentenced as an especially mitigated offender and, given the serious nature of the offenses, the court did not abuse its discretion in refusing to do so.). As to defendant Akins, we conclude that the trial court did not abuse its discretion in not sentencing him as an especially mitigated offender. Accordingly, we affirm the twenty-year sentence.

## CONCLUSION

Based upon the authorities and reasoning set out herein, we affirm the judgments of the trial court as to both defendants.

_____
ALAN E. GLENN, JUDGE

-25-